Not Intended for Print Publication

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **GREGORY LANGADINOS**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:05CV00039 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **APPALACHIAN SCHOOL OF** | ) | By: James P. Jones |
| **LAW, ET AL.,** | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

*Gregory Langadinos, Plaintiff Pro Se; Warren David Harless and Nichole Buck Vanderslice, Christian & Barton, LLP, Richmond, Virginia, and Thomas R. Scott, Jr., Street Law Firm, LLP, Grundy, Virginia, for Defendants.*

In this pro se action for damages by a former law student against faculty members, administrative officials, and the law school, the defendants move for the dismissal of each of the plaintiff's federal claims under Federal Rule of Civil Procedure 12(b)(6). Because the plaintiff's lengthy complaint makes it clear that he can prove no set of facts in support of the federal claims, the defendants' motion will be granted.

The plaintiff, Gregory Langadinos, filed this action on his own behalf against Appalachian Law School ("ASL"), ASL President and Chief Executive Officer Lucius F. Ellsworth, Interim Dean Paul Eric Lund, Assistant Dean Wendy B. Davis, and Professors David T. Butleritchie and Dale Rubin. The plaintiff is a Greek-American graduate of ASL. He alleges that while he was a student, the defendants discriminated against him on the basis of his "Greek ancestry, Greek race, [and] Greek ethnicity."[1] (Pl.'s Am. Compl. ¶ 2.) The plaintiff's 47-page, 166-paragraph Amended Complaint and attached 22 pages of newspaper articles, letters, and other materials claim instances of verbal harassment and resulting mental distress.[2]

The plaintiff asserts that the defendants' discriminatory actions constituted violations of federal civil rights statutes. He also alleges state law causes of action for breach of contract, infliction of emotional distress, violation of Virginia's Consumer Protection Act, Va. Code Ann. § 59.1-196 to 59.1-207 (Michie 2001 & Supp. 2005), false imprisonment, and assault and battery. Jurisdiction is asserted on the basis of

---

[1] Although the plaintiff briefly mentions that he was discriminated against on the basis of his sex and that he has a learning disability, the complaint, even liberally construed, cannot be seen as alleging claims of sex discrimination or violations of the Americans with Disabilities Act. (*See* Pl.'s Am. Compl. ¶¶ 91, 116.)

[2] The plaintiff also submitted a 98-page "Offer of Proof/Appendix" with his Amended Complaint.

federal subject matter as well as diversity of citizenship and amount in controversy. 28 U.S.C.A. §§ 1331, 1332(a) (West 1993 & Supp. 2005).

Langadinos initially filed this action in the United States District Court for the Eastern District of Virginia. The defendants filed a Motion to Dismiss the plaintiff's federal claims.[3] After receiving a *Roseboro*[4] notice, the plaintiff responded to the Motion to Dismiss. Following the defendants' reply, venue was transferred to this court. The Motion to Dismiss the federal claims is now ripe for decision.[5]

## II

The facts as alleged by the plaintiff are as follows.

First, the plaintiff alleges that Assistant Dean Davis discriminated against him. Davis and the plaintiff were seated together at an April 2002, banquet. The plaintiff claims that Davis made the following comments during dinner:

> "Greg do you own a restaurant . . . do you know that you look like you are on the television show the SOPRANOS . . . Are you related to John

---

[3] The defendants first moved to dismiss all claims, but thereafter amended the Motion to Dismiss to limit it only to the plaintiff's federal claims.

[4] *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975).

[5] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

Case 1:05-cv-00039-JPJ   Document 40   Filed 09/25/05   Page 3 of 36   Pageid#: 84

> Gotti, the Teflon-Don?"  "Greg are you from Revere, Massachusetts?"
> "Greg do you own an IROC Z28?"  "Did you ever own a restaurant?" . . .
> "Greg you look like a gangster, like somebody that is a member of the
> Mafia who comes from Revere, Massachusetts."[6]

(Pl.'s Am. Compl. ¶¶ 29-30.)  The plaintiff alleges that Davis laughed at him "while making frequent hostile stares and continuing to repeat the same comments."  (*Id.* ¶ 30.)  The plaintiff further alleges that this harassment continued for a year and a half, stating that "after the Summer of 2002, Defendant Davis continuously and viciously verbally assaulted the Plaintiff repeating the same bigoted statements, that 'Greeks own restaurants and diners and are not cut out to be lawyers.'"  (*Id.* ¶ 31.)  He claims that Davis "verbally harassed [him] . . . in calling him a 'Vinny' 'Guido' 'Mafia member' and 'John Gotti' amongst numerous other discriminatory remarks and treatment including asking the Plaintiff 'if you own a diner or a restaurant.'"  (*Id.* ¶ 89.)

---

[6]    The defendants argue that "Langadinos is offended by certain remarks that—although arguably derogatory toward Italian-Americans, Jewish-Americans, and Caucasians—make no mention of Greek-Americans." (Defs.' Mot. Dismiss at 12 (citations omitted).)  The plaintiff may still establish a cause of action under the Civil Rights Act despite the defendant's mistaken belief that his ethnic characteristics are those of a person of Italian, rather than Greek, descent.  Plaintiffs do not lose the protection of discrimination laws because they are discriminated against for the wrong reasons.  *See, e.g., Estate of Amos ex rel. Amos v. City of Page, Ariz.*, 257 F.3d 1086, 1094 (9th Cir. 2001) (white plaintiff mistakenly believed to be a member of a protected class); *LaRocca v. Precison Motorcars, Inc.*, 45 F. Supp. 2d 762, 770 (D. Neb. 1999) (terms derogatory to Mexican persons used for Italian plaintiff).

- 4 -

Davis allegedly told the plaintiff that he was "not going to graduate . . . because you're going to get kicked out of this school," and that he did not "fit in around here" and "should get counseling" because he had "no people skills" and is "a bully." (*Id.* ¶¶ 69-70.) Finally, the plaintiff states that when he decided to appeal the grade he received in a class taught by Professor Kelly, Davis "told Plaintiff[] if he appealed the grade he received in Employment [L]aw and if such an appeal sets a precedent that grades can be overturned the Plaintiff would be in a world of hurt." (*Id.* ¶ 38.)

Next, the plaintiff alleges that Professor Rubin discriminated against him at a reception held in Washington, D.C. When the plaintiff told Rubin about his plans to appeal his grade, he alleges that Rubin "began to speak in the same way Defendant Davis had spoken to Plaintiff . . . by attempting to talk the Plaintiff out of the idea of appealing his grade. . . . Defendant Rubin also demanded that Plaintiff must not appeal his grade." (*Id.* ¶ 41.) The plaintiff and Rubin then talked about the September 11, 2001, terrorist attacks on the World Trade Center. The plaintiff alleges that Rubin

> stated . . . in an extremely irrational manner and loud tone of voice, "I do not believe the Arabs were the pilots that flew the planes into the buildings on 9-11. I think there is a much bigger story behind the attacks. I bet the Jews were involved, because none of the people that died in the buildings were Jews. It was all fixed. The Jews killed . . . Jesus; do you really think they would think twice about killing 3000 working class people in New York City."

(*Id.* ¶ 42.)

The conversation between the plaintiff and Rubin then turned to former ASL student Odighizuma, who murdered ASL's dean, a faculty member, and a student, and injured three others in a January 2002, shooting spree at the law school.[7]  The plaintiff alleges that Rubin stated, "Dean Sutin got what he deserved from that cat Odighizuma." (*Id.* ¶ 43.)  When the plaintiff asked what "cat" meant, he alleges that Rubin, who is African-American, responded, "'it[']s talk from the hood,' and . . . 'white people do not understand words like that.'" (*Id.*)  The plaintiff alleges that Rubin then asked, "'Do you know why I have never bothered to visit Europe? . . . Because of fuckin' white[] people.  I hate white people. . . .'" (*Id.* ¶ 45.)  He states,

> Rubin appeared to invite the Plaintiff [to the reception] in order to harass him and shock his conscience from Rubin's continuous bigoted and irrational comments about his hatred toward White people, Jewish people, law students, people from "the North" and numerous other groups of people including people who come from Europe such as the Plaintiff whose parents are both from Greece.

(*Id.* ¶ 45.)  Finally, the plaintiff alleges that Rubin told him "to 'shut the fuck up'" when he asked the professor why he attended the reception when white people made up the majority of the crowd.  (*Id.* ¶ 46.)

Next, the plaintiff alleges that Professors Rubin and Butleritchie discriminated against him at a meeting in Rubin's office.  He claims that the professors "forcibly

---

[7] *See* Francis X. Clines, *3 Slain at Law School; Student Is Held*, N.Y. Times, Jan. 17, 2002, at A18.

slammed the door shut, locked the door, and ordered the Plaintiff in a very threatening manner to sit [] down." (*Id*. ¶ 50.) Rubin then accused the plaintiff of putting soap in a hot tub at the YMCA and of causing problems in a local discount store. (*Id*. ¶ 51.) The plaintiff alleges that Rubin stated, "'Greg, the whole world doesn't revolve around you. Greg you do not pay attention to people and you are pushy.'" (*Id*. ¶ 52.) Butleritchie then allegedly said, "Greg you will be dismissed from this law school if we want you to be. And you will not get certified to take the Bar exam in whatever State you plan to practice in.'" (*Id*.)

The plaintiff alleges that Butlertichie then began speaking in an "extremely threatening voice" and said,

> "You are going to be a dead man soon. You pissed off a bunch of rednecks and we think they have reason to actively hunt you down and kill you." ["]You ought to leave Grundy as soon as possible. These rednecks from Hurley, they will kill you, and there is nothing that you or your friends from Boston or the Northeast can do to stop it." Defendant Butlerichie repeated over and over again, "The whole world does not revolve around you asshole, your [sic] going to get what is coming to you."

(*Id*. ¶ 54 (emphasis omitted).) The plaintiff alleges that Rubin made similar statements, warning,

> "Greg, you have pissed off a whole bunch of Red Necks in this town. There are people from the town of Hurley, Virginia that are after you and they are going to find you and beat the shit out of you and you will be down under ground a few feet. People from this area are going to kill

- 7 -

you.  It's that simple.  They are going to find you and you will be beaten and left for dead."

(*Id*. ¶ 55 (emphasis omitted).)  During this confrontation, the plaintiff alleges that the defendants called him a "white bitch" "on several occasions."  (*Id*. ¶ 110.)

The plaintiff also alleges that Rubin and Butleritchie "pitted and put student Robert Meadows up to the task of severely harassing Plaintiff on the basis of his Greek ethnic background."  (*Id*. ¶ 66.)  During a class meeting, Meadows allegedly said to the plaintiff, "You're a fucking Yankee from Maine, and I should kill you for that reason alone."  (*Id*. ¶ 63.)  When the plaintiff clarified that he was not a Yankee, but was from Greece, and that he was not from Maine, but from Massachusetts, Meadows allegedly replied, "So your [sic] Euro trash that is what it is."  (*Id*.)

The plaintiff next alleges that President Ellsworth discriminated against him by refusing to accept the plaintiff's written complaints about the confrontation with Rubin and Butleritchie, by demanding that the plaintiff not involve the police in the matter, and by ignoring comments he overheard Davis making to the plaintiff.  (*Id*. ¶¶ 56, 7.)  Further, the plaintiff alleges that Ellsworth and Davis discriminated against him by refusing to punish Meadows, the student who threatened him.  (*Id*. ¶¶ 56, 59, 64-65.)

Finally, the plaintiff alleges that Interim Dean Lund discriminated against him by failing to "take any preventative measures" or investigate what happened during

- 8 -

the confrontation between the plaintiff, Rubin, and Butleritchie, even though Lund launched an investigation when, in an unrelated event, another student misused an ASL e-mail account.  (*Id*. ¶¶ 76, 82.)

III

A motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the plaintiff is not entitled to relief.  The court may not dismiss a complaint unless the plaintiff can prove no set of facts which would entitle the plaintiff to relief.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The "issue is not whether plaintiff will ultimately prevail or is likely to prevail but whether claimant is entitled to offer evidence to support claims." *Scheuer v. Rhodes*, 416 U.S. 232, 232 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984).  It is not necessary to set forth a particular legal theory. Rather, a party is required only to make "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.  8(a);  *see* Charles Alan Wright, *Law of Federal Courts* § 68 (5th ed. 1994).

The court is obligated to construe the complaint as asserting "any and all legal claims that its factual allegations can fairly be thought to support."  *Martin v. Gentile*,

849 F.2d 863, 868 (4th Cir. 1988). As a general rule, the court is under an even greater duty to construe complaints liberally when a plaintiff proceeds without a lawyer. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).[8]

Nevertheless, the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987) (internal citations omitted). The court has an affirmative obligation to prevent "factually unsupported claims" from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). In addition, when the complaint contains detailed factual descriptions, the court is not required to ignore those facts where it appears beyond doubt that, even considering all inferences in the plaintiff's favor, they cannot support the plaintiff's claims. *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (stating the court is "not required to ignore facts alleged in the complaint that undermine plaintiff's claim").

The defendants have moved to dismiss each of the plaintiff's federal claims on various grounds. Because the plaintiff's lengthy complaint makes it clear that he can prove no set of facts in support of his claims, that motion will be granted.

---

[8] Although the plaintiff in this case is a law school graduate, he is not yet licensed to practice law. (*See* Pl.'s Am. Compl. ¶ 101.) Accordingly, I will read his complaint as I would that of any other pro se plaintiff.

A

The defendants first move for the dismissal of the plaintiff's civil rights claims under 42 U.S.C.A. § 1981[9] and Title VI of the Civil Rights Act of 1964.[10] The plaintiff contends that the defendants violated these statutes by discriminating against him on the basis of his Greek ancestry, race, national origin, and/or ethnicity. More specifically, the plaintiff alleges discrimination both during interactions with ASL faculty members and as a result of his discrimination complaints. Accordingly, his allegations will be treated as asserting harassment[11] and retaliation claims.

Title VII provides the appropriate framework for analyzing the plaintiff's claims. *Jane v. Bowman Gray Sch. of Med.-N.C. Baptist Hosp.*, 211 F. Supp. 2d 678, 690 (M.D.N.C. 2002); *see also Middlebrooks v. Univ. of Md.*, No. 97-2473, 1999 WL 7860 at *4 (4th Cir. Jan. 11, 1999) (unpublished). Using that framework, the plaintiff's harassment claim will be analyzed like a hostile work environment claim.

_____

[9] Section 1981 provides in relevant part that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C.A. § 1981(a) (West 2003).

[10] Title VI provides in relevant part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.A. § 2000d (West 2003 & Supp. 2005).

[11] Harassment claims are actionable under both Title VI and § 1981. *See Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) (citation omitted); *Dennis v. County of Fairfax*, 55 F.3d 151, 155 (4th Cir. 1995) (section 1981 racial harassment claim in the employment context).

*Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).  Although not required to allege

each element of a prima facie case at this stage of the litigation, the plaintiff ultimately

will be required to show that the harassment he complains about was (1) unwelcome;

(2) based on race (§ 1981) or color or national origin (Title VI);[12] (3) sufficiently

severe or pervasive to alter the terms and conditions of schooling and create an

abusive atmosphere; and as to the claim against ASL, (4) imputable to the school.  *See*

*Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing

*Causey*, 162 F.3d at 801).  To support his retaliation claim, the plaintiff ultimately will

be required to show that: (1) he engaged in a protected activity; (2) the defendants

---

[12] The defendants contend that the plaintiff is not in a class of persons protected under Title VI and § 1981 because he is "an American-born, English-speaking, Caucasian male with Eastern European features." (Defs.' Mot. Dismiss at 11 n.5.)  These facts alone do not exclude the plaintiff from a protected class.  *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 610-13 (1987) (explaining that "all those who might be deemed Caucasian today were not thought to be of the same race at the time § 1981 became law" and that "discrimination [against] identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics . . . is racial discrimination that Congress intended the statute to forbid").  Indeed, § 1981 has been held to encompass claims of discrimination by one Caucasian person against another.  *See* 15 Am. Jur.2d Civil Rights § 28 (2005) (collecting cases).  Although the question of whether Greek-American persons are in a protected class is one of first impression in this circuit, courts in other circuits have held that they are protected.  *See Gamas v. Anheuser-Busch, Inc.,* No. Civ.03-89-PB, 2005 WL 419690, at *1 (D.N.H. Feb. 23, 2005) (holding that Greek national origin is not protected by § 1981, but Greek ancestry is); *Ress v. Comptroller's Office of Ill.*, No. 97 C 5569, 2000 WL 28265, at *6 (N.D. Ill. Jan. 12, 2000) (stating "[h]e is of Greek origin and therefore a member of a protected class"); *Bernhardt v. Interbank of N.Y.*, 18 F. Supp. 2d 218, 224 (E.D.N.Y. 1998) (holding that Greek-American had established prima facie case of national origin discrimination under Title VII).  I will assume, without deciding, that the second generation Greek-American plaintiff is a member of a protected class.

- 12 -

took an adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action. *See King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003) (employment context); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457-58 (4th Cir. 1989) (stating that a plaintiff may prove ¶ 1981 retaliation claim using Title VII framework). From the plaintiff's detailed allegations it is apparent, even at this motion to dismiss stage, that his harassment and retaliation claims are factually unsupported.

### 1. Individual Defendants.

First, the plaintiff's hostile environment and retaliation claims against the individual defendants under Title VI must be dismissed because Title VI applies only to the recipients of federal funding. *Farmer v. Ramsay*, 41 F. Supp. 2d 587, 592 (D. Md. 1999) ("The lower federal courts have generally held that 'the proper defendant in a Title VI case is an entity rather than an individual'" (quoting *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293 (S.D. Tex. 1996))). The plaintiff has failed to allege that any of the individual professors or faculty members are the recipients of Title VI funds. Accordingly, his Title VI claim against defendants Ellsworth, Rubin, Davis, Butleritchie, and Lund will be dismissed.

Next, the defendants' individual liability under § 1981 for creating a hostile environment or retaliation requires examination of the specific allegations made

- 13 -

against each one of them. Individual defendants are liable under § 1981 only when they "intentionally cause a corporation to infringe the rights secured by" that section. *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1145 (4th Cir. 1975). The defendants argue that the plaintiff can prove no set of facts showing the required intent. I will not address this argument because I find that even if the defendants' actions were taken with discriminatory intent, the plaintiff's contention that those actions infringed his rights secured under § 1981 is unsupported by the facts alleged.

The plaintiff's numerous factual allegations make it clear that none of the individual defendants' behavior was sufficiently severe or pervasive to state a claim for a racially hostile environment. The "severe or pervasive" element of a harassment claim has both a subjective and an objective component. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). To determine whether any of the defendants created an objectively hostile environment at ASL, the court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with the plaintiff's performance, and what psychological harm resulted. *See Harris*, 510 U.S. at 21-23; *Conner v.*

- 14 -

*Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 193 (4th Cir. 2000). This standard is a "demanding" one. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

The most disturbing events alleged are attributed to Professors Rubin and Butleritchie. These include Rubin's statements at a Washington, D.C., reception about white and Jewish persons, and Rubin's and Butleritchie's efforts to "pit[] and put student Robert Meadows up to the task of severely harassing Plaintiff." The alleged harassment is punctuated by the meeting at which the professors yelled at the plaintiff and told him that "rednecks" wanted to kill him. These allegations, even when viewed in the light most favorable to the plaintiff, reveal that the plaintiff's § 1981 harassment claim against Rubin and Butleritchie is legally insufficient.

Rubin's comments at the D.C. reception, while certainly offensive and inappropriate, were made in a social setting far removed from the school while the plaintiff and defendant were "drinking socially." (Pl.'s Am. Compl. ¶ 41.) The plaintiff does not allege that the behavior in question continued once the two returned to Grundy. Further, the plaintiff's allegations as to Robert Meadows are based upon unwarranted inferences. Meadows approached the plaintiff after a class taught by a professor unconnected to this litigation. (*See* Pl.'s Am. Compl. ¶ 62.) Rubin and Butleritchie were never mentioned in the conversation. The plaintiff simply concludes that Rubin and Butleritchie were behind Meadows' actions "[b]ased on information

- 15 -

and belief as well as Plaintiff's conversations with other faculty members and employees of the Law School, who know about the dangerous propensities of Defendants Rubin and Butleritchie." (Pl.'s Am. Compl. ¶ 66.) This gossip and speculation is insufficient to link Meadow's actions with those of the defendants.

Even the August 20, 2002, meeting between the plaintiff, Rubin and Butleritchie—the most obviously severe event alleged both in terms of hostility and physicality—fails to support the plaintiff's claim that these individual defendants violated his rights. The plaintiff's own detailed complaint reveals that his conclusory description of the encounter is not accurate. The plaintiff repeatedly alleges that professors Rubin and Butleritchie threatened to kill him, but he quotes the professors as stating that "rednecks" from Hurley, Virginia wanted to kill him. This was a warning, albeit a frightening one, but not a threat. Similarly, the allegations that the professors "forcibly slammed the door shut, locked the door, and ordered the Plaintiff in a very threatening manner to sit . . . down," and that Butleritchie spoke in an "extremely threatening voice" (*id*. ¶¶ 50, 54), certainly created an uncomfortable situation, but not one that rose to the level of violating the plaintiff's rights. Evidence that a plaintiff was subject to callous words or treatment is insufficient to support a hostile environment claim. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 611 (4th Cir. 1999), *abrogation on other grounds recognized by Hill v. Lockheed*

- 16 -

*Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004). Even viewed in the light most favorable to the plaintiff, neither Rubin nor Butleritchie engaged in behavior that created an objectively severe or pervasive environment.

The plaintiff alleges that Assistant Dean Davis harassed him for the longest period of time and on the most occasions, but the plaintiff's allegations against Davis demonstrate that the behavior at issue was not sufficiently severe. The comments Assistant Dean Davis allegedly made at the April 2002, law school banquet, including statements such as "you look like you are on the television show the *Sopranos*," were certainly unprofessional, but at most constituted simple teasing. Although the plaintiff alleges that Davis continued calling him "Vinny," "Guido," "Mafia member," and "John Gotti" for a year and half, these comments are more in the nature of nicknames. *See Payano v. Fordham Tremont CMHC*, 287 F. Supp. 2d 470 (S.D.N.Y. 2003) (fellow employees' jokes that the plaintiff looked like an Arab terrorist constituted simple teasing); *cf. White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297 (4th Cir. 2004) (repeatedly calling black employee "'boy, jigaboo, nigger, porch monkey, Mighty Joe Young,' and 'Zulu warrior'" raised jury question in hostile work environment claim). Even Davis' most egregious comment, that "Greeks own restaurants and diners and are not cut out to be lawyers," does not rise above the level of a "mere offensive utterance." Plaintiffs are not guaranteed refinement and

sophistication in their interactions at work or, in this case, school. *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) (describing Title VII). Rather, they are protected only from "harassing behavior that is so severe or pervasive as to render the [classroom] objectively hostile or abusive." *Id.* Davis' actions, even when viewed in the light most favorable to the plaintiff, fail to rise to this level.

Each of the remaining individual defendants is alleged to have engaged in behaviors far less offensive and even more infrequent than those alleged against Rubin, Butleritchie, and Davis. Accordingly, I will grant the defendants' motion to dismiss the plaintiff's § 1981 claims against each of the individual defendants.

The plaintiff's final claim against the individual defendants is that they discriminated against him in retaliation for his reports of discrimination. The plaintiff has alleged facts in support of the first element of retaliation—that he engaged in a protected activity. He filed two discrimination complaints with the U.S. Department of Education's Office of Civil Rights ("OCR") and another with the Virginia higher education authorities. (Pl.'s Am. Compl. ¶¶ 73, 78.) However, he fails to allege any facts in support of the second element—that any of the defendants took the equivalent of an adverse employment action against him. In the employment context, an adverse employment action has been described as an "ultimate employment decision[] such as hiring, granting leave, discharging, promoting, and compensating." *Page v. Bolger*,

645 F.2d 227, 233 (4th Cir. 1981). No equivalent action is alleged to have taken place here. The plaintiff merely states that "[a]fter the conclusion of the OCR investigation, the hostility toward the Plaintiff by the Law School administration not only continued, but increased," and that he was subject to an "enormous amount of disrespect." (*Id*. ¶¶ 78, 79.) None of the defendants is alleged to have actually done anything adverse to the plaintiff's status as a student. He successfully completed his law school coursework and graduated, though the plaintiff made a personal decision not to attend the graduation ceremony. He even successfully appealed a grade in one course. (*Id*. ¶ 37.) For these reasons, the defendants' motion to dismiss the plaintiff's § 1981 retaliation claims against the individual defendants also will be granted.

## 2. ASL.

Next, I will consider the plaintiff's harassment and retaliation claims under Title VI and § 1981 as they are asserted against the law school itself. The facts alleged by the plaintiff, even if taken as true and considered in the light most favorable to him, make it clear that the plaintiff can prove no set of facts in support of several elements of his Title VI and § 1981 hostile environment claims against ASL. He has not sufficiently stated that the acts alleged were based on his race, national origin, or color; that the alleged discrimination was sufficiently "severe or pervasive;" or that the acts of the individual defendants can be imputed to ASL.

- 19 -

First, although the plaintiff has alleged that some of the defendants made specific reference to his Greek features, he also has pled facts that make it clear that much of the conduct about which he complains was not connected to his race or national origin. The plaintiff concludes that virtually anything he found objectionable at his school was tied to race and national origin discrimination. However, his description of the facts contradicts that conclusion. For example, the plaintiff alleges no facts to support his conclusion that Davis and Rubin discouraged him from appealing a grade because of his race or national origin. Rather, the plaintiff quotes Davis as explaining that she did not want him to "set[] a precedent that grades can be overturned." (Pl.'s Am. Compl. ¶ 38.) *Cf. Settle v. Baltimore County*, 34 F. Supp. 2d 969, 1003 (D. Md. 1999) (refusing to consider allegedly discriminatory acts when "the content of the allegations is racially neutral, and there is no evidence . . . that the underlying acts . . . occurred because" of the plaintiff's race). The plaintiff makes only conclusory allegations that Lund and other administrators failed to order an investigation into his complaints and otherwise "covered up" misconduct because of his race or national origin.

Even the most egregious allegation—that Rubin and Butleritchie yelled at the plainitff and told him that "rednecks" wanted to kill him—is not connected by any alleged facts to the plaintiff's race or national origin. The plaintiff does, however,

- 20 -

offer several nonracial reasons for the defendants' behavior: they believed he caused problems at a local store (Pl.'s Am. Compl. ¶ 51); they believed he was "pushy" (*Id.* ¶ 52); and they thought that local people wanted to kill him (*Id.* ¶¶ 54-55). The few references made to the plaintiff's characteristics included professor Butleritchie's comment about the plaintiff's "friends from Boston or the Northeast" and the professors' use of the term "white bitch." The former does not refer to a protected trait, *see Chaplin v. Du Pont Advance Fiber Sys.*, 293 F. Supp. 2d 622, 628 (E.D. Va. 2003) ("Confederate-American" not a protected class); *Williams v. Frank*, 757 F. Supp. 112, 120 (D. Mass. 1991) ("Southernness is not a protected trait"), and the latter refers to a trait other than the one under which the plaintiff claims protection.

The fact that the plaintiff was "the only fully ethnic, bilingual Greek American full-time law student" (Pl.'s Am. Compl. ¶ 26) does not justify an inference that every action of which he complains occurred because he is Greek. *See Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000) ("A plaintiff's subjective belief or speculation that neutral statements are discriminatory does not establish a claim of hostile work environment.") The plaintiff would have been subject to much of the same conduct even if he were not Greek. *See Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir.1996) (a plaintiff must show that but

- 21 -

for her membership in a protected class, she would not have been subjected to harassment).

Next, even if each of the incidents alleged were in fact related to the plaintiff's race or national origin, the plaintiff fails to allege conduct either severe or pervasive enough to support a hostile environment claim. As previously explained, the "severe or pervasive" element has both a subjective and an objective component. *Harris*, 510 U.S. at 21-22. The plaintiff's complaint makes it clear that he perceived the environment at ASL to be discriminatory and abusive. This perception, and the plaintiff's entire law school experience, was no doubt strongly influenced by the fact that he witnessed the murder of a fellow student just one week after arriving on campus. Indeed, the plaintiff's treating psychiatrist suggests that this trauma, together with the academic pressures of law school, were responsible for increasing the plaintiff's stress level and worsening his attention deficit disorder. (Pl.'s Am. Compl. Ex. 9.) In addition, the plaintiff's perception was influenced by the "culture shock" he experienced upon moving to the small town of Grundy, Virginia. (*See* Pl.'s Am. Compl. ¶ 85.) However, when viewed from the reasonable person objective standard, the defendants' actions were not severe or pervasive enough to create an abusive environment.

As previously discussed, none of the defendants' individual actions created an objectively severe or pervasive environment. Even when culminated and construed in the most liberal fashion, the alleged actions of the defendants do not and could not satisfy the "very high" standard, *Faragher*, 524 U.S. at 788, necessary to create the kind of hostile or abusive environment at ASL that is actionable under federal law. At most, the plaintiff describes an ongoing saga of rudeness, insensitivity, and personality clashes. *See McGuire v. Va.*, 988 F. Supp. 980, 991 (W.D. Va. 1997) ("Personality conflicts . . . are not equivalent to discrimination or retaliation, even when such conflicts generate antipathy and make an individual's position more difficult") (internal citation omitted), *overruled on other grounds*, *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 436 (4th Cir. 1998). As he explained in his own words, "a certain amount of friction was probably inevitable at the Defendant Law School, as an experimental law school in the very rural country-side of Virginia, given that conflicting cultures were thrown together." (Pl.'s Am. Compl. ¶ 87).

Finally, it is clear that the plaintiff can prove no set of facts establishing liability on the part of ASL for the harassment he suffered. The plaintiff must allege facts that would allow the conduct of the individual defendants to be imputed to ASL. The analysis of this element in the school setting departs somewhat from the Title VII framework. Unlike employers, who can be vicariously liable for the discriminatory

acts of their employees, schools can be held liable under Title VI and § 1981 only for

intentional conduct because those statutes prohibit only intentional discrimination.

*See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (§ 601 claim); *Murrell v. Ocean*

*Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001) (§ 1981 claim) (citing *Gen.*

*Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982)).  In other

words, a school faces liability only when it intentionally does something wrong, not

when it merely sits by and does nothing at all.  *See Pryor v. Nat'l Collegiate Athletic*

*Ass'n*, 288 F.3d 548, 568 (3rd Cir. 2002) (rejecting theory that deliberate indifference

to plaintiffs' civil rights is actionable in school setting) (citing *Alexander*, 532 U.S.

at 279).

 The theory of the plaintiff's harassment claims against ASL is that the school

is liable for the individual defendants' acts as a result of its "conscious disregard" for

the plaintiff's rights.  However, he does not allege, except in scattered conclusory

statements, that discriminatory animus motivated the school's inaction.  In other

words, the plaintiff asserts that the school is liable merely because it failed to do

anything to help him.

 The plaintiff's Amended Complaint is replete with factual allegations against

the school and its officers, but all focus on their omissions, rather than on any

intentional decision to discriminate.  The plaintiff alleges that: (1) ASL failed to

enforce its nondiscrimination policies, failed to alert the sheriff's office about threats made against the plaintiff, refused to punish student Robert Meadows, and failed to discourage the defendants from violating the plaintiff's rights; (2) Interim Dean Lund, President Ellsworth, and Assistant Dean Davis failed to order any investigation into Professors Rubin and Butleritchie; (3) Ellsworth refused to write an affidavit for the local sheriff's office on the plaintiff's behalf, refused to accept the plaintiff's written complaints, and failed to prevent a conspiracy among Rubin, Butleritchie, and Davis; (4) Ellsworth and Davis failed to order a "tribunal to investigate" Meadows; and (5) the Chairman of ASL's Board of Trustees refused to order any investigation into the plaintiff's complaints and failed to do anything to stop the alleged harassment. (*Id*. ¶¶ 19-20, 56-57, 59, 61, 72, 75, 82-85, 103, 111.)

Furthermore, the plaintiff presents an alternate explanation for ASL's inaction, one which was not motivated by the plaintiff's race or national origin. As the plaintiff explains, ASL was undergoing the American Bar Association accreditation process during the time period in question and could not afford to let any misconduct become known. (Pl.'s Am. Compl. ¶ 85.) The plaintiff even gives examples of other conduct the administration was "covering up," including one professor's drunk driving and another one's affair with a student. (*Id*.) These allegations fail to state any actionable basis for institutional liability. Even if true and considered in the light most favorable

- 25 -

to him, they show that ASL failed to protect the plaintiff from the defendants' harassment because it wanted to become accredited, not because the plaintiff is Greek-American. Accordingly, I will grant the defendants' motion to dismiss as to the plaintiff's Title VI and § 1981 harassment claims against ASL.

Furthermore, I will also grant the defendants' motion to dismiss the plaintiff's retaliation claims against ASL. As I have already explained, the plaintiff has failed to allege that any adverse action was taken against him.

B

The defendants next move for the dismissal of the plaintiff's civil conspiracy claim under 42 U.S.C.A. § 1985(3).[13] The plaintiff asserts this claim against all defendants in connection with the August 20, 2002, confrontation with professors Rubin and Butleritchie. The plaintiff states that Rubin and Butleritchie acted "separately and in concert" and "conspired together . . . by following their custom,

---

[13] Section 1985(3) provides in relevant part:

> If two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages . . . against any one or more of the conspirators.

42 U.S.C.A. § 1985(3) (West 2003).

- 26 -

practice or usage, of treating a selected few students and Professors 'deliberately indifferent' to their federally protected rights." (Pl.'s Am. Compl. ¶¶ 103, 108-09.) The plaintiff further alleges that ASL, Ellsworth, Lund, and Davis participated in the conspiracy because they knew, or should have known, that Rubin and Butleritchie were injuring him, but they failed to do anything about it. (*Id*. ¶ 111.)[14]

The defendants move for the dismissal of the plaintiff's § 1985(3) claim on the grounds that it is barred by the intracorporate conspiracy doctrine, and that the plaintiff can prove no set of facts establishing a "meeting of the minds" among the defendants. For the following reasons, I agree.

First, the defendants argue that it is legally impossible for the defendants to have engaged in a conspiracy. "It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy." *Buschi v. Kirven*, 775 F.2d 1240, 1251-52 (4th Cir. 1985) (applying this rule in the § 1985 context). Under the intracorporate conspiracy doctrine, "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *See id*. at 1251 (citing *Nelson Radio & Supply Co. v. Motorola,*

---

[14] The plaintiff also alleges in this claim that the defendants were state actors. (Pl.'s Am. Compl. § 106.) As explained in section IIIC of this Opinion, that argument is rejected. However, this is not fatal to the plaintiff's claim because § 1985(3) does reach private conspiracies in which there is "'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Gen. Bldg. Contractors Ass'n*, 458 U.S. at 390 n.17 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

*Inc.*, 200 F.2d 911, 914 (5th Cir. 1952)).  Although this doctrine arose in the antitrust context, it consistently has been applied in the Fourth Circuit to actions brought under §§ 1983 and 1985.  *See Veney v. Ojeda*, 321 F. Supp. 2d 733, 748 (E.D. Va. 2004). Exceptions to the intracorporate immunity doctrine exist for an agent's unauthorized acts or when an agent "has an independent personal stake in achieving the corporation's illegal objective."  *Buschi*, 775 F.2d at 1252-53 (quoting *Greenville Publ'g Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974) and citing *Hodgin v. Jefferson*, 447 F. Supp. 804, 807 (D. Md. 1978)).

In this case, the complaint itself makes clear that the intracorporate conspiracy doctrine applies.  The defendants are ASL, which is a corporation, and certain ASL administrators and professors, who are agents of the corporation.[15] *See, e.g., Rothman v. Emory Univ.*, 828 F. Supp. 537, 543 (N.D. Ill. 1993) (holding dean, assistant dean, and others at private law school to be protected by intracorporate conspiracy doctrine). Furthermore, the plaintiff has failed to allege facts that would place any of the defendants within an exception to the doctrine.  Each of the defendants is alleged to have engaged only in authorized acts falling within the scope of his or her employment and is not alleged to have obtained any personal benefit from their

---

[15] The plaintiff has sued the individual defendants in both their official and individual capacities.  Naming the agents in their individual capacities does not destroy their immunity under the intracorporate conspiracy doctrine.  *Buschi*, 775 F.2d at 1252.

interactions with the plaintiff.  *See Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (affirming dismissal of § 1985(2) claim where "[e]very one of the defendants who was involved in the so-called conspiracy was either a trustee or faculty member of the Brooklyn Law School—which is admittedly an educational corporation—and was acting in that capacity").  I hold that the intracorporate conspiracy doctrine prevents the plaintiff from stating a claim under § 1985(3).

In addition, the defendants argue that the plaintiff can prove no set of facts establishing the prima facie element of a "meeting of the minds" among them.  It is "well settled" that "a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights" in order to prove a § 1985(3) conspiracy.  *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995) ( citations omitted).  The plaintiff fails to allege that ASL, Ellsworth, Lund, and Davis reached any such agreement.  Rather, he states that those defendants knew that Rubin and Butleritchie "were incompetent, immoral, racist, selfish, power-hungry, childish, and severely under[-]qualified to be employed as professors of law;" that they knew or should have known Rubin and Butleritchie had injured the plaintiff, other students, and professors; and that they "took no steps or efforts to halt . . . this course of conduct, nor to make redress to Plaintiff or other Professors and other students that have complained and have been injured by Defendant[]s Rubin and Butleritchie."

- 29 -

(Pl.'s Am. Compl. ¶¶ 107, 111.)  The plaintiff fails to allege any specific agreement, meeting of minds, or mutual understanding among these defendants.  Furthermore, even if the defendants had together agreed not to take action against Rubin and Butleritchie, the plaintiff has failed to allege that impermissible considerations of race or national origin played any part in that agreement.  *See Griffin*, 403 U.S. at 102 (defendants must act with "class-based, invidiously discriminatory animus"); *Simmons*, 47 F.3d at 1376-77 (same).

The plaintiff does allege that there was meeting of the minds between Rubin and Butleritchie to deprive him of his rights, but he does so only in a conclusory manner.  He states,

> Plaintiff believes from personally experiencing and being victimized . . . that on August 20, 2002 Defedant[]s Butleritchie, and Rubin, conspired together to destroy the mental well being of the Plaintiff,  by following their custom, practice or usage, of treating a selected few students and Professors 'deliberately indifferent' to their federally protected rights to be free from arbitrary deprivations of life, liberty, and the pursuit of happiness.

(Pl.'s Am. Compl. ¶ 109.)  The Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts."  *Simmons*, 47 F.3d at 1377; *see also Lewin v. Cooke*, 95 F. Supp. 2d 513, 525 (E.D. Va. 2000) ("Because of the high threshold that a [p]laintiff must meet to establish a prima facie case under section

- 30 -

1985, courts often grant motions of dismissal.").  It is true that the plaintiff alleged that Rubin and Butleritchie together met with him on August 20, 2002, and that the defendants made similar statements during this meeting.  However, this circumstantial evidence is probative of a conspiracy only through speculation.  For these additional reasons, the plaintiff's claims under § 1985(3) must be dismissed as to all defendants.

C

Finally, the defendants move to dismiss the plaintiff's claims under 42 U.S.C.A. § 1983[16] on the ground that he can prove no set of facts establishing that any of the defendants acted under "color of state law."

Section 1983 protects individual rights only from government action, not private action.  "[M]erely private conduct, no matter how discriminatory or wrongful,'" does not fall within the ambit of § 1983.  *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948)).  Accordingly, a plaintiff asserting a claim under § 1983 must be able to show "that the defendant deprived him of [a] constitutional right 'under color of any statute, ordinance,

---

[16]  Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

42 U.S.C.A. § 1983 (West 2003).

regulation, custom, or usage, of any State or Territory.'" *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214-15 (4th Cir. 1993) (quoting § 1983). This requirement is equivalent to the "state action" requirement under the Fourteenth Amendment. *Id*.

A private entity may be considered a state actor for purposes of a constitutional challenge if its conduct is "fairly attributable to the state." *Blum*, 457 U.S. at 1004. In this case, the plaintiff acknowledges that ASL is not a public entity, but a private corporation. (Pl.'s Am. Compl. ¶¶ 5, 8.) However, he alleges that the defendants' conduct is fairly attributable to the state for the following reasons:

(a). The Law School received approximately Five Hundred Thousand Dollars ($500,000) from a quasi-Federal-State Agency known as the "Appalachian Regional Commission."

(b). The Law School receives Federal Financial Aid and is a Title IV institution pursuant to the Higher Education Act of 1965. . . and the law school[] allows student loans borrowed under [the] Stafford Loan Program to suffice as tuition money for over 300 students per semester.

(c). The Buchanan County Board of Supervisors[] controls the majority of the Law School's Board of Trustees, electing 10 out of the 19 members of the Defendant Law School's Board of Trustees. . . .

(d). The Defendant Law School has sufficient personal involvement with the Commonwealth of Virginia's Buchanan County Board of Supervisors.

(Pl.'s Am. Compl. ¶ 22.)

- 32 -

Even assuming these facts could establish that ASL is a state actor,[17] the ultimate issue in this case is whether the plaintiff has alleged that the school's action in harassing him can fairly be seen as state action. *See Rendell-Baker*, 457 U.S. at 838; *Robinson v. Davis*, 447 F.2d 753 (4th Cir. 1971). The plaintiff must allege by more than mere conclusions that the state participated in, coerced, or significantly

_____

[17] Courts have consistently found that private universities are not state actors. *See Allen v. Tulane Univ.*, No. 92-4070, 1993 WL 459949, at *2 (E.D. La. Nov. 2, 1993) (collecting cases). On the infrequent occasions when private schools have been held to be state actors, it is because their actions satisfied one of three tests: (1) the public function test, (2) the regulation/public funding test, or (3) the symbiotic relationship test. *See Haavistola*, 6 F.3d at 215. None of the reasons cited by the plaintiff individually or collectively appear to fulfill any of these tests. Private law school education is not a "public function" making operation of a school attributable to the state. *Grafton v. Brooklyn Law Sch.*, 478 F.2d 1137, 1140 (2d Cir. 1973). The receipt of federal and state funds does not make ASL's actions attributable to the state. *See Blum*, 457 U.S. at 1011 (holding private nursing home did not engage in state action despite extensive regulation by state and receipt of 90 percent of its income from state); *Rendell-Baker v. Kohn*, 457 U.S. 830, 841-43 (1982) (holding that private school receiving at least ninety percent of its operating budget from state funds pursuant to state contracts was not engaged in state action within the meaning of § 1983); *Hicks v. S. Md. Health Sys. Agency*, 737 F.2d 399, 403 (4th Cir. 1984) ("It is well-settled that the receipt of federal funding, by itself, will not establish federal action."). Nor is participation in federal student loan programs any indication that ASL is a governmental actor. *See Fischer v. Driscoll*, 546 F. Supp. 861, 867 (E.D. Pa. 1982) (collecting cases). The fact that the Buchanan County Board of Supervisors appoints some members of ASL's board would be significant only if their involvement makes the county capable of influencing board decisions, which the plaintiff has not alleged. *See Kerr v. Enoch Pratt Free Library of Baltimore City*, 149 F.2d 212, 214 (4th Cir. 1945) (stating that "to make a corporation a public one its managers must not only be appointed by public authority, but subject to its control."); *Braden v. Univ. of Pittsburgh*, 552 F.2d 948, 960 (3rd Cir. 1977); c*f. Downs v. Sawtelle*, 574 F.2d 1, 8 (1st Cir. 1978) (finding state action where town appointed entire board of hospital, regulated the hospital, had a right to receive hospital profits and, on dissolution, assets).

- 33 -

encouraged ASL's conduct. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 n.17 (1974).

Although the plaintiff has alleged that the county and school are connected in several ways, he has not alleged any facts to show that the state acted to deprive him of his rights. The fact that the Buchanan County Board of Supervisors elected several individuals, who are not named in connection with any of the discriminatory acts the plaintiff allegedly experienced, to serve on ASL's board does not support an inference of state action on the part of the school with respect to that discrimination. *See Robinson*, 447 F.2d at 757-58 (holding that the fact that several individuals served simultaneously as college and as municipal officials and that campus security officers also served as town police officers and wore their town uniforms on campus did not support a finding of state action with respect to certain disciplinary proceedings). Likewise, the fact that the chairman of the Board of Trustees may have had knowledge of the defendants' discriminatory actions does not make those actions attributable to the state merely because, as the plaintiff asserts, the chairman is also a state court judge. (Pl.'s Resp. at 6.) There has been no allegation, aside from the plaintiff's conclusory statement that the "Law School's policymakers" followed "policies and customs . . . 'deliberate[ly] indifferen[t]'" to his rights (Pl.'s Compl. ¶ 126), that the chairman or any other county-appointed official encouraged, condoned, or participated

- 34 -

in the plaintiff's harassment. Without a sufficient connection between the acts of the defendants and the allegedly discriminatory activity, the plaintiff fails to state a claim under § 1983.

Finally, the plaintiff has also failed to allege that the individually named faculty members and professors ever acted under color of state law. In order to state a claim, the plaintiff must allege that these individuals are clothed with the authority of state law so as to be state actors themselves, acted together with state actors, or engaged in conduct otherwise chargeable to the state. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). In his complaint, the plaintiff repeatedly alleges that Davis, Rubin, Butlertichie, Ellsworth, and Lund violated his rights, but he fails to allege any facts that would tie those violations to authority of the state. Accordingly, the plaintiff's claims under § 1983 must be dismissed as to all defendants.

IV

For these reasons, it is **ADJUDGED AND ORDERED** as follows:

1. The defendants' Motion to Dismiss is GRANTED; and

2.    Causes of Action One through Four of the plaintiff's

Amended Complaint are DISMISSED.

ENTER: September 25, 2005

/s/ JAMES P. JONES
Chief United States District Judge